UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEVIN STEWART, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AMAZING GLAZED, LLC, )<br>)<br>Defendant. ) | Civil Action No. 05-1724<br>Judge Nora Barry Fischer |

**MEMORANDUM OPINION**

**I.    Introduction**

This is an employment discrimination case brought by an African American male, Kevin Stewart ("Plaintiff") who was an employee of Amazing Glazed, d/b/a Krispy Kreme Doughnuts ("Defendant") located in Monroeville, Pennsylvania. Plaintiff was hired on May 24, 2003 as a doughnut producer and was subsequently promoted to the position of shift supervisor. In January of 2005, Plaintiff alleges that he complained to Defendant about racially derogatory remarks made by his coworkers. On or about May 5, 2005, Plaintiff was terminated by Defendant. Defendant claims that Plaintiff was terminated because he violated Defendant's attendance policy by not coming to work and for failing to contact the General Manager to "call off" from work for two shifts (May 4, 2005 and May 5, 2005). Plaintiff argues that Defendant's management scheduled him to work during a week that had already been approved for his vacation and that, in any event, he appropriately notified his employer that he would not be available for his scheduled shifts by "calling off" in accordance with company policy. Plaintiff alleges that his termination occurred as the result of discrimination on the basis of his race and retaliation in violation of the Civil Rights

1

Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964 ("Title VII") as well as in violation of the Pennsylvania Human Relations Act ("PHRA").

## II.     Procedural History

Defendant filed its Motion for Summary Judgment on January 18, 2007. Judge Hardiman, the judge formerly assigned to this case, granted three requests for extensions of time to file briefs (two for Plaintiff, one for Defendant). (*See* Document Nos. 31, 33, 39). Consequently, this motion was not fully briefed until April 12, 2007. (*See* Document No. 40). In the interim, this case was transferred to the undersigned judge upon Judge Hardiman's elevation to the Third Circuit. (*See* Text Only Entry of April 6, 2007). On May 21, 2007, the undersigned Judge ordered a settlement conference in this matter, which occurred on July 5, 2007. (Document No. 41; Text Only Entry of July 5, 2007). However, this case did not settle as the result of those negotiations. Accordingly, Defendant's Motion for Summary Judgment is now before this Court.

## III.    Standard of Review

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In evaluating the evidence, the court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Watson v. Abington Twp.*, 478

F.3d 144, 147 (3d Cir. 2007). Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324. The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

Upon reviewing Defendant's Motion for Summary Judgment and supporting brief (Document Nos. 26, 27), Plaintiff's brief in opposition (Document No. 34), and Defendant's Reply (Document No. 40), it is clear that, as to both Plaintiff's discrimination claim and retaliation claims, genuine issues of material fact remain in dispute and summary judgment is inappropriate. Accordingly, for the reasons set forth below, Defendant's Motion for Summary Judgment is DENIED.

**IV.** **Factual Background**

    **A.** **Plaintiff's Employment History With Defendant and Acknowledgment of Defendant's Policies.**

Defendant, a licensed franchisee of Krispy Kreme Doughnuts, hired Plaintiff on May 24, 2003 as a third shift doughnut producer. (Document No. 28, Concise Statement of Material Facts

3

in Support of Amazing Glazed, LLC's Motion for Summary Judgment, "Defendant's Facts" at ¶¶ 2, 6).[1] Thereafter, in September or October 2003, Plaintiff was promoted from third shift doughnut producer to third shift supervisor. *Id.* at ¶ 36. In the spring of 2005, Plaintiff was named a daylight shift production supervisor. *Id.* at ¶ 49; Plaintiff's Facts at ¶ 49. As a shift supervisor, Plaintiff's supervisors were various managers, as well as the general manager and assistant general manager. Deposition of Kevin Stewart at p. 45; Deposition of Eric Williams at p. 58.

At the beginning of his employment, Defendant provided Plaintiff with an Employee Manual and two days of training regarding company policies and eight days of training in making doughnuts. *Id.* at ¶ 10. Plaintiff provided written confirmation that he received and reviewed Defendant's Employee Handbook on June 13, 2003. *Id.* at ¶¶ 11-12.

Defendant's Employee Handbook sets forth the following attendance policy:

It is essential for the success of the company and for the security of everyone's job that the company provides its customers with the best and most consistent service. In order to accomplish this objective, regular and prompt attendance at work, is required. Employees are required to be available to work schedules posted up to and including overtime. Attendance consists of call-offs, lateness, and no call/no shows. The policy below has been established and will be enforced as a means to keep the rate of absenteeism to an acceptable one.

If you are a no call/no show for a scheduled shift, you will be terminated.

*Id.* at ¶ 21.

Plaintiff acknowledged that he understood the attendance policy, that a no call/no show was grounds for termination and that he was required to be at work, on time, as set

---

[1]Except as otherwise noted, Defendant's Facts cited to herein are admitted to by Plaintiff in Plaintiff's Response to Defendant's Undisputed Statement of Material Facts at Document No. 36 ("Plaintiff's Facts"). In addition, Plaintiff filed a Statement of Material Facts Precluding Summary Judgment (Document No. 35, "Plaintiff's Supplemental Facts").

forth on the schedule. *Id.* at ¶ 22. Plaintiff also admits that it was his responsibility to check the schedule on a daily basis and that he was responsible for the shifts he was scheduled to work. *Id.* at ¶¶ 23, 24. Defendant states that pursuant to Defendant's attendance policy, and as conveyed verbally to Stewart and the other management staff by General Manager Marcus Abbott ("GM Abbott") in early 2005, any call off made by a manager or supervisor had to be made directly to GM Abbott. *Id.* at ¶¶ 25, 27. Plaintiff denies that he was required to call off to GM Abbott, and denies that GM Abbott told him that he must do so. Plaintiff's Facts at ¶ 25.

Plaintiff received vacation time as a benefit from his employer. Plaintiff's Supplemental Facts at ¶ 14. In late 2004 or early 2005, Plaintiff requested vacation time for his trip to Florida from April 29, 2005-May 5, 2005. *Id.* at ¶¶ 15, 20; *see also* Defendant's Facts at ¶ 63. Plaintiff claims that this request was made in accordance with Defendant's policy requiring that employees take vacation in one week increments. Plaintiff's Supplemental Facts at ¶ 21. Defendant, however, argues that employees were permitted to take vacation in two or three day increments. Deposition of Marcus Abbott at pp. 25, 28; Deposition of Eric Williams at p. 18. In addition, Defendant argues that its Employee Handbook also allows Defendant to amend its policies, such as the vacation and call off policies, as necessary. (Document 40 at p. 6).

Defendant also maintains a non-harassment policy, which provides that:

> The Company is committed to providing a workplace free of sexual harassment and/or discrimination, as well as unlawful harassment and/or discrimination based on age, ancestry, color, sexual preference, marital status, medical condition, mental disability, physical disability, (including any condition or disability of persons

> infected with HIV virus or persons with AIDS), national origin, race, religion, sex, sexual orientation or veteran status. The Company does not tolerate harassment or discrimination of employees by managers, supervisors, or co-workers and will also attempt to protect employees from harassment or discrimination by non-employees in the workplace. Moreover, the Company will not tolerate retaliation against any employee who reports harassing or discriminatory conduct.
>
> Guidelines: The Company is committed to preventing and investigating incidents of harassment and/or discrimination and to responding to such incidents with appropriate disciplinary and other actions up to and including discharge, regardless of whether such incidents appear to be in violation of existing statutes. The Company's primary concern is providing an optimal work environment for all employees.
>
> The Company will not condone or tolerate sexual or other harassment. Sexual or other harassment by any employee may be grounds for immediate termination. All complaints and occurrences regarding discrimination, including sexual or other harassment, should be promptly directed to your Supervisor. Should the activity continue, call the Human Resources Department (570-675-8100).

Defendant's Facts at ¶ 28. Plaintiff was familiar with and understood this policy, although Plaintiff denies that the policy was strictly followed. *Id.* at ¶15; Plaintiff's Facts at ¶13. In addition, Plaintiff understood that harassing behavior should be reported to his supervisor and that if such behavior continued, Plaintiff was to report the same to the Human Resources Department, as set forth in the anti-harassment policy. Defendant's Facts at ¶ 16.

**B.     Plaintiff's Allegation of Racial Discrimination**

In the fall of 2004, Plaintiff complained to representatives of Defendant that Brian Lechty ("Lechty"), a production manager for Defendant, made a racially derogatory comment in the workplace, specifically, that someone had "nigger-rigged" the doughnut carts by improperly stocking them. Defendant's Facts at ¶¶ 101, 103. Plaintiff's brother, Keith Stewart, heard Lechty make this comment and informed Plaintiff of the comment. *Id.* at ¶ 101, 102. Plaintiff did not hear Lechty make this comment. *Id.* at ¶ 104. Plaintiff reported Lechty's comment to General Manager

6

Saban ("GM Saban") and Assistant General Manager Fecho (" AGM Fecho"). Plaintiff did not contact Defendant's Human Resources Department or call the toll-free number to report Lechty's comment. *Id.* at 103, 105. Plaintiff does not know whether or to what extent, if any, GM Saban and AGM Fecho took action toward Lechty relative to this comment. *Id.* at ¶106. However, GM Abbott admits that Plaintiff complained that GM Saban and AGM Fecho failed to adequately respond to Lechty's use of the word "nigger." Plaintiff's Facts at ¶¶ 145-146.

In the Fall of 2004, Lechty also commented to a coworker, fellow production worker Debbie McClelland ("McClelland"), that he was going to "get the nigger's job." *Id.* at ¶ 107. Two or three weeks later, McClelland advised Plaintiff, her shift supervisor, of this comment. *Id.* at ¶ 108. Plaintiff believes this comment was directed toward him. *Id.* at ¶ 110. Plaintiff advised GM Saban and AGM Fecho of the comment. *Id.* at ¶ 111; but see *Id.* at 114; Plaintiff's Facts at ¶ 114; Plaintiff's Supplemental Facts at ¶ 40 (it is unclear from the record whether Plaintiff told GM Saban and AGM Fecho of the specific nature of Lechty's comment, or whether Plaintiff made a general statement as to Lechty being racist). Plaintiff and Defendant dispute whether AGM Fecho took action with regard to Plaintiff's complaint. Defendant's Facts at ¶¶ 114-118; Plaintiff's Facts at ¶¶ 114-118.

In late 2004 or early 2005, Emily Topley ("Topley"), the office manager at Defendant's Monroeville store, advised Plaintiff that she had heard that he was upset because someone had used the term "nigger rigging." Defendant's Facts at ¶¶ 122, 126. Topley also stated to Plaintiff that she had used the word. *Id.* at 129; *see also* Plaintiff's Facts at ¶¶ 127, 129 (Plaintiff states that Topley admitted to using the phrase "all the time" and that there was nothing wrong with it). Further, Topley told Plaintiff that he needed to take yoga lessons to relax and that she would call Plaintiff's

7

wife to tell her the same. Defendant's Facts at ¶ 130; Plaintiff's Facts at ¶ 130. Plaintiff reported this conversation to AGM Fecho, who agreed with Plaintiff that use of the phrase was not acceptable. Defendant's Facts at ¶¶ 131, 132. Plaintiff was satisfied with this response and did not ask AGM Fecho to take further action, nor did Plaintiff report the same to Defendant's Human Resources Department. *Id*. at ¶¶ 133-134.

Plaintiff also recalls a conversation with Kevin Martin, who told Plaintiff that "no matter what you hear, don't believe it, I'm not a racist, you know me." *Id*. at ¶ 128. Plaintiff thinks that this conversation related to an incident between Martin and another manager, but Plaintiff does not have first hand knowledge of the conversation and does not have a specific recollection of what that conversation involved. *Id.* at ¶¶ 39-41.

Plaintiff does not know whether GM Saban or AGM Fecho communicated Plaintiff's complaints to GM Abbott or DM Williams. *Id.* at ¶¶ 145-146. However, GM Abbott admits that Plaintiff complained that GM Saban and AGM Fecho failed to adequately respond to Lechty's use of the word "nigger." Plaintiff's Facts at ¶¶ 145-146.

**C.     Plaintiff's Vacation**

Plaintiff recalls that he wrote the requested vacation days in a black book kept in the office. Defendant's Facts at ¶65. The only black request book kept in the office, however, does not indicate that Plaintiff requested any days off in April or May of 2005. *Id.* at ¶ 67. AGM Fecho testified that Plaintiff told him that he wrote his request in a red request book used by supervisors to request time off. Plaintiff's Supplemental Facts at ¶ 18. Defendant was unable to locate or produce this red book

8

during discovery. *Id.* at ¶ 19.² Plaintiff does not recall telling GM Saban or AGM Fecho the specific dates of his vacation. Defendant's Facts at ¶¶ 63, 64. However, on the day before Plaintiff's departure, Plaintiff did remind GM Abbott that he was leaving for vacation. *See* Plaintiff's Facts at ¶¶ 71-74.

Although Plaintiff acknowledges that he was required by company policy to check the work schedule daily, Plaintiff admits that he last checked the posted schedule two or three weeks before he left for vacation, at which point, the schedule reflected that Plaintiff was to be on vacation from April 29 through May 1. Defendant's Facts at ¶¶ 23, 69. Despite his admission that he last checked the schedule two or three weeks before his vacation, Plaintiff denies that the schedule for May was posted on April 22, one week before his scheduled departure, and in fact, denies that the schedule was posted at the time Plaintiff left for vacation. *Id.* at 70; Plaintiff's Facts at 69, 70.

On May 1, Plaintiff called his work place to determine whether he had been scheduled for the remaining days he had requested off. Defendant's Facts at ¶ 75. On May 1, Plaintiff spoke to manager Linda Vagnier ("Ms. Vagnier"), who informed Plaintiff that he was scheduled to work on Wednesday, Thursday and Friday (May 4-6).³ *Id.* at ¶ 80. Upon learning that he did not receive said

---

²Defendant's Answers to Plaintiff's Interrogatories state that no one person was the custodian of the red book and that Defendant believes that the red book for 2005 was discarded in early 2006 by Ken Crisafio, Defendant's Director of Operations, while cleaning the office. Defendant also states that the red book was discarded at the end of the year as a matter of practice. (Document No. 37-3 at p. 4). Whether any inference may be drawn from this fact must be determined by the fact finder at trial. *Schmid v. Milwaukee Elec. Tool. Corp.*, 13 F.3d 76, 78 (3d Cir. 1994) (Where evidence is destroyed, sanctions may be appropriate, including a jury instruction on the "spoliation inference." This inference permits the jury to assume that "the destroyed evidence would have been unfavorable to the position of the offending party.").

³Although Defendant's Statement of Facts alleged that Plaintiff was scheduled for vacation on Tuesday, May 3, Defendant's facts later allege that Plaintiff was scheduled to work on Tuesday, May 3. Plaintiff admits that he was scheduled to work on Tuesday, May 3.

9

days off, Plaintiff told Ms. Vagnier that he was calling off for the remaining days of his vacation. Plaintiff's Facts at ¶ 81. Defendant contends that Ms. Vagnier then told Plaintiff that she didn't have the authority to accept his "call off" and informed Plaintiff that he needed to call GM Abbott. Defendant's Facts at ¶ 82. Defendant also contends that two other employees who were in the office when Ms. Vagnier received the call from Plaintiff heard Ms. Vagnier repeat to Plaintiff several times that he had to call GM Abbott. Defendant's Facts at ¶ 83. Plaintiff, however, denies that Ms. Vagnier told him to call GM Abbott. *Id.* at ¶ 84; Plaintiff's Facts at ¶¶ 82, 83.

Plaintiff next called in to work sometime on Thursday, May 5, 2005, although the parties dispute whether this call occurred in the morning or the afternoon. Defendant's Facts at ¶ 96; Plaintiff's Facts at ¶ 95. At that time, Plaintiff spoke with District Manager Eric Williams ("DM Williams"), who asked Plaintiff to come into work at 6:00 pm that day to meet with him and GM Abbott. Defendant's Facts at ¶ 96. During this meeting, DM Williams and GM Abbott advised Plaintiff that he would be terminated for being a no show/no call for his scheduled shifts on Wednesday, May 4 and Thursday, May 5. Defendant's Facts at ¶ 97. Defendant alleges that GM Abbott made the decision to terminate Plaintiff. *Id.* at ¶ 98. Plaintiff, however, contends that DM Williams made the decision to terminate Plaintiff and that GM Abbott agreed with that decision. Plaintiff's Facts at ¶ 98.

---

*Compare* Defendant's Facts at 79-80 *with* Defendant's Facts at 86, 89. While it is unclear whether Plaintiff was scheduled to work on Tuesday, May 3, resolution of this factual discrepancy is not necessary, as the two days at issue in this case are Wednesday and Thursday, May 4 and 5. Plaintiff's Facts at ¶ 97; Defendant's Facts at ¶ 97.

10

V.     **Analysis**

   A.     **Plaintiff's Race Discrimination Claims**

The parties agree that Defendant's Motion for Summary Judgment as to Plaintiff's race discrimination claims must be analyzed using the *McDonnell Douglas* burden shifting analysis.[4] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); (Document No. 27 at p. 3); (Document No. 34 at p. 2). Pursuant to *McDonnell Douglas* and its progeny, (1) plaintiff must establish a prima facie case; (2) defendant must then offer a legitimate nondiscriminatory reason for the employment decision in question; and (3) plaintiff may then demonstrate that the stated reason is merely pretext for illegal discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802-803.

Accordingly, Plaintiff must first establish a prima facie case, or, at a minimum, Plaintiff must show that a genuine issue of material fact exists with respect to an element of his prima facie case. In order to prove a prima facie case of race discrimination, Plaintiff must show (1) that he is a member of a protected class; (2) that he was qualified for the position in question; (3) that he suffered an adverse employment action; and (4) that similarly situated employees, not of the protected class, received more favorable treatment. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n. 6 (1981).

The parties do not dispute that Plaintiff meets the first and third elements of a prima facie case. Indeed, Plaintiff is a member of a protected class (African-American) who suffered an adverse employment action when he was terminated from his position with Defendant. The parties do dispute, however, whether the Plaintiff has satisfied elements two and four, above.

---

[4]The same analysis applied to Plaintiff's Title VII retaliation claim also applies to Section 1981 and PHRA retaliation claims. *Woodson v. Scott Paper Co.*, 109 F.3d at 920; *Schorr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999).

### 1. Plaintiff's Qualification For The Job

Defendant argues that Plaintiff fails to state a prima facie case of discrimination because he cannot establish that he is qualified for the position from which he was terminated– shift supervisor at the Krispy Kreme Doughnuts located in Monroeville, Pennsylvania. In support of this argument, Defendant argues that reporting to work is an essential job function and that because Plaintiff failed to do so on May 4 and 5, 2005, Plaintiff is *per se* unqualified for his position. (Document No. 27 at p. 4).

Defendant's legal argument is not persuasive. In support thereof, Defendant cites several cases involving the Americans with Disabilities Act ("ADA") where the plaintiff was unable or unwilling to come to work on a regular basis because of a physical disability. *See, e.g. Tyndall v. National Educ. Centers, Inc.*, 31 F.3d 209 (4th Cir. 1994). Here, Plaintiff is physically able to work and functioned in his position as shift supervisor from September or October of 2003 until the time of his termination in May of 2005. Accordingly, the cases cited by Defendant are factually distinguishable from the present case. Further, while the record reflects factual issues as to the level at which Plaintiff performed his job duties while employed by Defendant (*compare* Defendant's Facts at ¶¶ 52-57 *with* Plaintiff's Facts at ¶¶ 52-57), in order to state a prima facie case, Plaintiff need only show that he possessed the necessary training and experience to do his job. *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 342 (3d Cir. 1990). That Plaintiff performed his job as a shift supervisor for more than a year and a half is sufficient to satisfy this element of Plaintiff's prima facie case. *Cheatom v. Burger King*, 05-251, 2006 WL 435732 *3 (E.D.Pa. Feb. 22, 2006).

### 2. Whether Similarly Situated Employees, Not of the Protected Class, Received More Favorable Treatment

Defendant argues that Plaintiff cannot establish that similarly situated employees, not of the protected class, were treated more favorably. Plaintiff may establish this element of his prima facie case by showing that his position was filled by someone who is not in the protected class. *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 939 (3d Cir. 1997). In doing so, Plaintiff alleges that he was replaced by a white male named John Paul Vagnier ("Mr. Vagnier"), the son of manager Ms. Vagnier. Although Plaintiff puts forth little evidence that he was actually replaced by Mr. Vagnier, Plaintiff's argument cites deposition testimony of Ms. Vagnier in which she testifies that Mr. Vagnier was a shift supervisor in production at Defendant's Monroeville location. Deposition of Linda Vagnier at p. 44. This testimony, and the fact that Mr. Vagnier is a white male, is sufficient to create a genuine issue of material fact as to whether Defendant treated similarly situated employees, not of the protected class, more favorably.

Plaintiff also argues that a similarly situated white employee, Kevin Martin, a manager, did not call off properly on one occasion and was not terminated for that reason. Accordingly, Plaintiff asserts that Martin was treated more favorably under the same circumstances. In support of this position, Plaintiff cites the deposition testimony of GM Saban.

> Q. Can you tell me who did not call off appropriately?
> A. It's very hard to remember. I believe Kevin Martin. I can't remember if there was anyone else. It would have been documented though.
> Q. With respect to Kevin Martin, do you remember what the issue was with Mr. Martin not calling off appropriately?
> A. I do not, no.
> Q. Do you know if Mr. Martin was terminated for not calling off?
> A. I don't believe that was why he was terminated, no.

Deposition of GM Saban at p. 23.

This testimony is sufficient to show that an employee not of the protected class may have been given more favorable treatment under similar circumstances. GM Saban's testimony illustrates that he is unsure whether Kevin Martin violated the call off policy and that he does not know for sure why Kevin Martin was terminated. Because the record does not reflect conclusive evidence as to whether Kevin Martin violated Defendant's call off policy and whether he was terminated as the result of the same, whether Defendant treated Plaintiff and Kevin Martin differently is a question of fact for the jury to determine after viewing the evidence and making credibility determinations as to the testimony of Plaintiff and GM Saban.[5]

Accordingly, genuine issues of material fact exist as to whether Plaintiff has satisfied this element of his prima facie case and therefore, Defendant's Motion must be denied as to Plaintiff's race discrimination claims.

> **3. Issues of Fact Exist as to Whether Defendant's Proffered Non-Discriminatory Reason for Plaintiff's Termination Was Pretextual**

Regardless of this Court's decision as to Plaintiff's prima facie case of retaliation, Defendant's Motion must be denied because issues of fact exist with respect to whether Defendant's proffered reason for Plaintiff's termination was pretextual. This Court finds that issues of fact exist

---

[5]Defendant argues that, in his deposition, Plaintiff identified Debbie McClelland, a white, female shift supervisor of Defendant's, as an employee who was treated more favorably than Plaintiff in that she was not terminated when she was a "no call/no show" for work. Defendant explains that the reason for McClelland's no call/no show was that she was rushed to the hospital prior to her scheduled shift. Defendant excused McClelland's absence after she submitted proper medical documentation. Defendant's Facts at ¶¶ 150-156; Document No. 27 at pp. 5-6. Plaintiff, however, does not contend that McClelland is a valid comparator. (See Document No. 34 at p. 7). Accordingly, this Court need not consider this argument.

14

regarding Defendant's call off policy, and therefore, a jury could find that Defendant's proffered non-discriminatory reason for Plaintiff's termination is pretextual.

In order to create a genuine issue of material fact as to whether the proffered reason is pretextual, Plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve Defendant's articulated legitimate reason for Plaintiff's termination; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Plaintiff's job elimination and termination. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Here, a reasonable juror could find that Defendant's proffered reason for Plaintiff's termination is undermined. For example, the parties dispute precisely what was required of Plaintiff under Defendant's call off policy. Defendant maintains that supervisors and managers, including Plaintiff, could only call off by contacting the General Manager. Defendant's Facts at ¶ 25. Indeed, the general consensus among the employees deposed is that shift supervisors, such as Plaintiff, were required to call off to the General Manager. *See* Defendant's Facts at ¶ 25. Further, Defendant argues that GM Abbott advised the management staff, including Plaintiff, that GM Abbott was the only person who could accept a call off from the management staff. Defendant's Facts at ¶ 27.[6]

Plaintiff, however, contends that he was never told that he could only call off to GM Abbott. Plaintiff's Facts at ¶ 27. In fact, Plaintiff disputes Defendant's articulation of this policy entirely, stating that Defendant's policy only required that managers call off to their supervisors. Plaintiff's Facts at ¶ 25. In support of this statement, Plaintiff cites to his own deposition testimony, that of

---

[6]Some ambiguity exists here. Sarah Tassone testified that supervisors and managers could "call off" to either DM Williams or GM Abbott. Deposition of Sarah Tassone at pp. 11-12.

AGM Fecho, whose testimony arguably supports Plaintiff's position as to Defendant's call off policy ("My understanding is [shift supervisors] were supposed to. . . talk to a manager" Document No. 37-2 at p. 28) and Defendant's company handbook, which advises employees as follows: "If an employee is going to be absent, it is his/her responsibility to notify his/her supervisor at least three (3) hours in advance of scheduled starting time." (Document No. 37-4 at p. 18).[7] This call off, as written, policy clearly articulates that an employee may call off to his or her "supervisor." Plaintiff's supervisors included managers such as Ms. Vagnier as well as GM Abbott. Deposition of Kevin Stewart at p. 45; Deposition of Eric Williams at p. 58. Indeed, Plaintiff called off by speaking with manager Ms. Vagnier. Accordingly, pursuant to Defendant's written policy, Plaintiff arguably called off appropriately and therefore, his termination could give rise to an inference of retaliation. A fact finder could also reasonably determine that Defendant's call off policy was as stated by Defendant, and that Plaintiff failed to properly call off for his scheduled shifts. Accordingly, a reasonable juror could find that Defendant's proffered non-discriminatory reason for Plaintiff's termination was pretextual and therefore, Defendant's Motion must be denied.

**B.     Plaintiff's Retaliation Claim**

In order to establish a prima facie case of retaliatory discrimination, Plaintiff must prove (1) that the Plaintiff engaged in a protected activity, (2) that the employer took an adverse action against him, and (3) that a causal link exists between the protected activity and the employer's adverse action. *E.E.O.C. v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997), *cert. denied*, 522 U.S. 1147 (1998) *(citing Kachmar v. Sun-Gard Data Sys., Inc*., 109 F.3d 173 (3d. Cir. 1997)); *Woodson*, 109

---

[7]In addition, the policy provides that "if you are a no call/no show for a scheduled shift, you will be terminated." (Document No. 37-4 at p. 18).

F.3d at 920.

Once Plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer, who must proffer a legitimate, nondiscriminatory reason for terminating the plaintiff. *Woodson,* 109 F.3d at 920 n. 2 (citing *McDonnell Douglas Corp.,* 411 U.S. at 802); *see also, Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Once the defendant satisfies this burden, the burden then shifts back to the plaintiff who must establish that the proffered explanation is mere pretext for discrimination. *Woodson,* 109 F.3d at 920 n. 2.

### 1. Issues of Fact Exist With Respect to Plaintiff's Prima Facie Case Of Retaliation

Defendant concedes that Plaintiff engaged in protected conduct when he reported to his employer racially derogatory comments made by his coworkers. In addition, Defendant concedes that Plaintiff suffered an adverse employment action when he was terminated. The parties dispute, however, whether a causal link between Plaintiff's protected activity and Defendant's adverse employment action exists.

In determining whether a causal link exists between protected conduct and an adverse employment action, the Court must look to a "broad array of evidence" including temporal proximity of the protected conduct to the adverse employment action, evidence of ongoing antagonism and/or whether the plaintiff can cast doubt upon an employer's proffered reason for the adverse employment action such that this doubt is probative of a causal connection. *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265, 289 (3d Cir. 2001).

In the present case, the timing of Plaintiff's protected conduct in relation to his termination does not necessarily suggest that Plaintiff's complaints to management regarding the use of racially derogatory language resulted in his termination five months later. *See Williams v. Philadelphia*

17

*Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir 2004); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). The issue of timing is not dispositive of Plaintiff's prima facie case, however. While proximity of the protected act to the adverse employment action may be probative of relation, absence thereof does not preclude such an inference. In fact, timing alone is generally not sufficient to establish causation. *See, e.g. Thomas*, 351 F.3d at 114 (providing that "even if timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred."). Indeed, a determination of causation between a protected act and an adverse employment action requires an examination of the facts, including how proximate the events actually were and the context of such events. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). Accordingly, whether causation is established by the proximity of Plaintiff's protected acts to the adverse employment action is a factual dispute which must be resolved by a jury.

Further, Plaintiff does not present any evidence that those who made the decision to terminate him were even aware of his complaints to GM Saban and AGM Fecho. Deposition of Kevin Stewart at p. 69. This fact raises serious questions as to whether Defendant could have terminated Plaintiff in retaliation for his protected acts. *See Dow v. Total Action Against Poverty in Roanoke City*, 145 F.3d 653, 657 (4th Cir. 1998). Moreover, Plaintiff has not produced any evidence of ongoing antagonism to support his claim. *Abramson*, 260 F.3d at 289

However, viewing the facts in the light most favorable to Plaintiff, as the Court must do on a motion for summary judgment, the Court finds that a reasonable juror could find that Defendant's proffered reason for Plaintiff's termination is subject to attack or challenge, such that it is plausible that Defendant's decision to terminate Plaintiff was retaliatory. As set forth above, the parties

dispute precisely what was required of Plaintiff under Defendant's call off policy and therefore, whether Plaintiff called off properly or in violation of Defendant's policy. Accordingly, a genuine issue of material fact exists as to whether Plaintiff can show a causal link between Plaintiff's protected acts and his termination.

### 2. Issues of Fact Exist as to Whether Defendant's Proffered Non-Discriminatory Reason for Plaintiff's Termination Was Pretextual

Regardless of this Court's decision as to Plaintiff's prima facie case of retaliation, Defendant's Motion must be denied because issues of fact exist with respect to whether Defendant's proffered reason for Plaintiff's termination was pretextual. This Court finds that issues of fact exist regarding Defendant's call off policy, and therefore, a jury could find that Defendant's proffered non-discriminatory reason for Plaintiff's termination is pretextual.

In order to create a genuine issue of material fact as to whether the proffered reason is pretextual, Plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve Defendant's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Plaintiff's job elimination and termination. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

As set forth above, a reasonable juror could find that Defendant's proffered reason for Plaintiff's termination is pretextual, such that it is plausible that Defendant's decision to terminate Plaintiff was retaliatory. The parties dispute precisely what was required of Plaintiff under Defendant's call off policy and therefore, whether Plaintiff called off properly or in violation of Defendant's policy. Accordingly, viewing the facts in the light most favorable to the non-moving party, as this Court must, summary judgment is not appropriate as to Plaintiff's retaliation claim.

19

## VI. Conclusion

For the foregoing reasons, Defendant's Motion is DENIED. An appropriate order follows.

Dated: November 8, 2007

                                                                                         /s/ Nora Barry Fischer
                                                                                         Nora Barry Fischer
                                                                                         United States District Judge

cc/ecf: All Counsel of Record